UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO.  04-10101-LPC |
| KENNETH SMITH | ) ) | |
| Defendant. | ) ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND**
**OPPOSITION TO DOWNWARD DEPARTURE**

The United States submits this memorandum in advance of the November 16, 2004 sentencing of Kenneth Smith ("Smith").  Smith pleaded guilty on June 15 to a three-count Information charging him with failure to file U.S. Individual Income Tax Returns for the years 1997, 1998 and 1999, in violation of 26 U.S.C. § 7203.

**I.    Factual Background**

There are no material disputes between the parties over the relevant facts.

As summarized in the Presentence Report ("PSR"), at all relevant times, Smith was a physician who owned and operated a medical practice in Hyannis, Massachusetts specializing in obstetrics and gynecology.  Smith operated his practice as a Sub-Chapter S corporation under the name "Hyannis OB-GYN Associates, P.C." (hereafter, "Hyannis OB-GYN").

Internal Revenue Code § 6012 requires tax returns to be filed by all individuals whose gross income for the taxable year exceeds a specified threshold amount, referred to as the "exemption amount."  The exemption amounts during the years 1997 through 1999 for taxpayers, like Smith, who were living with their spouse at year-end and had the filing status of "Married Filing Joint" were $12,200 in 1997, $12,500 in 1998 and $12,700 in 1999.

In each of these years, Smith earned income, including income from the operations of Hyannis OB-GYN, substantially in excess of the governing exemption amount. Notwithstanding his receipt of such income, Smith did not timely file tax returns with the Internal Revenue Service for any of the years 1997, 1998 or 1999.

The income earned by Smith, and the taxes due and owing on that income, are set forth in the following table:

|  | <u>1997</u> | <u>1998</u> | <u>1999</u> | Total |
|---|---|---|---|---|
| Gross Income | $265,143.00 | $250,094.00 | $309,618.00 | $824,855.00 |
| Taxable Income | $251,338.00 | $205,530.00 | $291,071.00 | $747,939.00 |
| Total tax | $74,550.00 | $59,279.00 | $96,479.00 | $230,308.00 |
| - Paid withholding | $0.00 | $14,736.00 | $0.00 |  |
| - Estimated tax payments | $11,100.00 | $0.00 | $0.00 |  |
| - Wife's portion of tax | $0.00 | $0.00 | $29,479.00 |  |
| **Tax due and owing by SMITH** | **$63,450.00** | **$44,543.00** | **$67,407.00** | **$175,400.00** |

**II.     Application of Sentencing Guidelines**

As set forth in the plea agreement, the parties stipulate that the guidelines calculations should be performed pursuant to the Manual in effect at the time of the offense (November 1, 1998); that the applicable provisions are U.S.S.G. §§ 2T1.1 and 2T4.1; and that the combined tax loss resulting from the defendant's offenses for the years 1997, 1998 and 1999 equals $175,400. (<u>See</u> Plea Agreement ¶ 3).

The foregoing stipulations yield the following guidelines computation:

    Base Offense Level    15                 U.S.S.G. §§ 2T1.1 and 2T4.1(J)

| | | |
|---|---|---|
| Acceptance | (2) | U.S.S.G. § 3E1.1 |
| **TOTAL** | **13** | |

The Probation Department concurs with this offense level. (PSR ¶ 35).

Smith is in Criminal History Category I. (PSR ¶ 38). With an adjusted base offense level of 13, the resulting guidelines sentencing range is twelve to eighteen months. The applicable fine range is $3,000 to $30,000. (U.S.S.G. §§ 5E1.2).

### III. Sentencing Recommendation

Pursuant to the terms of the parties' plea agreement, the government recommends that the Court impose a sentence at the low end of the applicable guidelines range – i.e., imprisonment of one year and a day. Consistent with the plea agreement, the government further recommends a fine of $3,000, a special assessment of $300, and one year supervised release. (See Plea Agreement ¶ 4).

### IV. Defendant's Departure Arguments

By memorandum dated October 6, 2004, Smith has requested that the court depart downward from his guidelines sentencing range on two grounds: (a) mental and emotional condition, pursuant to U.S.S.G. § 5H1.3; and (b) family ties and responsibilities, pursuant to U.S.S.G. § 5H1.6. For the reasons set forth below, the government opposes a departure on either ground.

#### A. Mental and Emotional Condition (§ 5H1.3)

A mental or emotional condition is considered by the guidelines to be a discouraged factor, one that is "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." U.S.S.G. Ch.5, Pt. H, intro. comment. A district court may

depart on the basis of a discouraged factor only in an "exceptional case." U.S.S.G. Ch.5, Pt. H, intro. comment. Koon v. United States, 518 U.S. 81, 95-96 (1996) (courts should depart for a discouraged factor only when it is present to an exceptional degree); United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993) (same); United States v. Brooke, 308 F.3d 17, 19 (D.C. Cir. 2002); see also United States v. Maldonado-Montalvo, 356 F.3d 65, 74 (1st Cir. 2003); United States v. LeBlanc, 24 F.3d 340, 348 (1st Cir. 1994).

In assessing whether a defendant's mental or physical condition truly presents an "exceptional" case, most courts have identified the central issue as revolving around the Bureau of Prisons' ability to provide adequate treatment services, which the First Circuit has defined as services on "'a level equally commensurate with modern medical science and of a quality acceptable within prudent professional standards.'" United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004), *quoting* United States v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987); see also United States v. Studley, 907 F.2d 254, 258 (1st Cir. 1990) ("[a] defendant's unique mental or emotional condition is only relevant if the [BOP] does not have adequate treatment services."); United States v. Harpst, 949 F.2d 860, 861, 863 (6th Cir. 1991) (district court improperly departed downward under §5H1.3 based on its "fear that incarceration might well end in suicide" because, *inter alia*, the BOP "is legally charged with providing adequate facilities and programs for suicidal inmates"); United States v. Hilton, 946 F.2d 955, 960 & n. 5 (1st Cir. 1991) (no extraordinary physical impairment within the meaning of U.S.S.G. § 5H1.4 because the BOP could adequately accommodate the defendant's medical needs); United States v. LeBlanc, 24 F.3d at 348-349 ("no evidence that the [BOP] would be unable to adequately accommodate LeBlanc's medical needs"); United States v. Lujan, 324 F.3d 27, 31 (1st Cir. 2003) (same).

As a corollary to this issue, courts also have examined whether a defendant's condition is

such that a lengthy imprisonment would work "irreparable harm."  United States v. Maldonado-Montalvo, 356 F.3d at 74.[1]  In considering these factors, the First Circuit repeatedly has stressed its stringency in distinguishing between health problems that may be serious but that are not "extraordinary" and health problems that truly present an "extraordinary" case.  Derbes, 369 F.3d at 583.  Only the latter can justify a departure.

The information submitted by Smith in support of his departure request is not sufficient to clear this threshold.  Smith has filed letters from two psychiatrists: (a) Dr. Peter DeRosa, who treated the defendant during the period from March, 1996 through December, 2001; and (b) Dr. Kellie Bishop, who has treated the defendant from June, 2003 to the present.  (See Def. Exs. C and D).  Dr. DeRosa states in his letter that he provided counseling to Smith for symptoms of an adjustment disorder with mixed anxiety and depressed mood – a condition that Dr. DeRosa describes as having been caused principally by financial pressures.  According to Dr. DeRosa, Smith "manifested considerable coping skills," "exhibited no impairment of his decision-making capacity," and required no psychotropic medication.

Approximately 18 months after Smith's last psychotherapy session with Dr. DeRosa, and subsequent to relocating from Massachusetts to South Carolina, Smith began seeing Dr. Bishop in the summer of 2003.  Dr. Bishop diagnosed the defendant as having major depression and generalized anxiety disorder, which she describes as "quite common[ly]" found together.  He is currently prescribed two medications:  Zoloft (for depression) and Klonopin (for anxiety).

Smith's mental health condition, as described in the foregoing materials, does not warrant a departure, for two principal reasons.  First, his condition – in and of itself – is not extraordinary.  As

---

[1] In all but exceedingly rare situations, the ability of the Bureau of Prisons ("BOP") to provide adequate treatment will resolve any concern about the possibility of a defendant's suffering irreparable harm while incarcerated.

the First Circuit noted in United States v. Maldonado-Montalvo, depressive disorders affect approximately 19 million American adults; the record does not indicate that Smith has ever been diagnosed with "any extreme form of mental disease, such as psychosis or schizophrenia"; and based on all accounts, the defendant's condition is stable – indeed, he is presently employed as a physician in a South Carolina medical practice. United States v. Maldonado-Montalvo, 356 F.3d at 75 (vacating mental health departure for defendant who had been diagnosed with major depression).

Second, there is nothing to suggest that the BOP will be unable to provide adequate mental health treatment to Smith or that a 12-month period of incarceration will cause him irreparable harm. To the contrary, as described in the *Legal Resource Guide to the Federal Bureau of Prisons* (hereafter, the *Guide*), BOP provides a "full range of mental health services" to its inmates, including full-time staff psychologists, psychiatrists and community mental health specialists. See *Guide* at pp. 32-34.[2] Treatment services, including individual and group counseling and psychiatric medications, are available on both an outpatient basis and, if needed, on an inpatient basis at one of several psychiatric referral centers, including at the Federal Medical Center (FMC) Devens, Massachusetts. See *Guide* at 29, 32-34. During the most recent fiscal year for which statistics have been compiled, BOP psychologists conducted 248,358 mental health intake assessments, provided approximately 60,604 sessions of individual therapy and crisis counseling, and conducted 3,765 suicide risk assessments and 1,811 suicide watches. See Federal Bureau of Prisons: State of the Bureau 2003 at 16.[3] See also *Guide* at 30 (defining

---

[2] A full text copy of the *Guide* can be found at http://www.bop.gov/ipapg/legal_guide.pdf

[3] This annual report is available at http://www.bop.gov/ipapg/ipasob2003.pdf.

the "health care mission" of the BOP as providing "necessary medical, dental, and mental health services to inmates by professional staff in a manner consistent with community standards"); 28 C.F.R. § 549.41 ("A sentenced inmate may be voluntarily admitted for psychiatric treatment and medication when, in the professional judgment of qualified health personnel, such inmate would benefit from such treatment and demonstrates the ability to give informed consent to such admission.").

In addition to the array of counseling and therapy services that it offers, BOP also has a full range of psychotropic medications available in its formulary, including both of the medications that Smith currently is taking: Zoloft and Klonopin.[4]

In sum, Smith's mental health condition is not extraordinary. It is shared by millions of Americans and thousands of federal inmates. Moreover, BOP has the ability to provide Smith with the same treatment that he currently is receiving: psychotherapy, coupled with anti-depressants and anti-anxiety medication. For all of these reasons, Smith's request for a departure under U.S.S.G. § 5H1.3 should be denied. E.g., United States v. Maldonado-Montalvo, 356 F.3d at 75 (citing cases).

---

[4] A copy of the Bureau of Prison's National Formulary can be located at: http://www.bop.gov by following the links to the BOP Directory/Health Services Division/National Drug Formulary 2004. Zoloft is listed on the formulary at p. 73; Klonopin is listed at p. 30.

B. Family Ties and Responsibilities (§ 5H1.6)

Smith also moves for a departure under U.S.S.G. § 5H1.6, asserting that the financial and emotional impact that incarceration would have on his wife and daughter – whom he states suffer from mental health conditions of their own -- constitute extraordinary circumstances that warrant a departure. This argument is also unavailing.

In United States v. Pereira, 272 F.3d 76 (1st Cir. 2001), the First Circuit made clear that family hardship is, unfortunately, neither atypical nor unusual when a family member is incarcerated. For this reason, such hardships – without more – cannot justify a departure under § 5H1.6. Pereira, 272 F.3d at 80-83.

By way of illustration, the First Circuit cited in Pereira to a series of appellate cases in which considerable family hardships – both financial and emotional – had been deemed insufficient to take defendants out of the "heartland." The cases included situations such as: (1) the imprisonment of both the mother and father of a four-year old child, United States v. Carr, 932 F.2d 67 (1st Cir. 1991) (not extraordinary; vacating departure); (2) a defendant with a neurologically impaired nine-year old son and a wife with fragile mental health, United States v. Rybicki, 96 F.3d 754 (4th Cir. 1996) (not extraordinary; vacating departure); (3) a defendant who was a single mother and the sole provider for five children, one of whom had a substantial neurological impairment, United States v. Sweeting, 213 F.3d 95 (3d Cir. 2000) (not extraordinary; no departure); (4) a defendant who supported three children and had a wife with depressive disorder and panic attacks, United States v. Goff, 20 F.3d 918, 921 (8th Cir. 1994) (no departure warranted); and (5) a defendant who was a single mother with three children under the age of four, where incarceration would require placing the children in foster care, United

States v. Dyce, 91 F.3d 1462 (D.C. Cir. 1996) (not extraordinary; vacating departure).

As the First Circuit held in Pereira, in view of the significant hardships that courts have deemed to lie within the "heartland," Smith cannot supportably contend that his situation should for some reason be found so uniquely exceptional as to fall outside that "heartland." Although incarcerating Smith will undeniably have a substantial financial impact on his family, that is true in virtually every case involving a defendant who is the principal breadwinner for his or her spouse and children. E.g., United States v. Rushby, 936 F.2d 41, 42-43 (1st Cir. 1991) (no departure for defendant who was main breadwinner for wife and two children). In addition, the PSR establishes that other sources of financial support are available to Smith's family: his mother apparently already provides approximately $5,000/month to Smith and his wife, in addition to paying for their daughter to attend a private preparatory academy. (PSR ¶¶ 65, 100 Note 9). Reductions also seem possible in the family's considerable monthly expenses, which include lease payments for a luxury SUV, yacht club dues, over $1,000/month for clothes and entertainment, and $84-$116/month for manicures. (PSR ¶¶ 100, 100A).[5]

With respect to the asserted emotional impact of incarceration, that, too, exists in every case involving a defendant with a spouse and/or dependents. To the extent that Smith asserts that the impact here would be heightened by the fact that his wife and daughter are seeing therapists in connection with their own mental health issues,[6] the government notes that the list

---

[5] The PSR notes that Smith has incurred expenses during the relevant time period for other high price items, including the repayment of over $60,000 in car loans on two BMW's (PSR ¶ 102), purchases at Tiffany's (PSR ¶ 100A), and the like.

[6] According to the PSR, the defendant has not submitted to Probation any records relating to his daughter's mental health condition or any records relating to his wife's asserted physical ailments. (PSR ¶ 126).

of cases cited in Pereira included several where appellate courts considered – and rejected – § 5H1.6 departure requests made by defendants who claimed that one or more family members suffered from psychological, neurological or other impairments.  E.g., United States v. Rybicki, 96 F.3d 754 (4th Cir. 1996) (no departure despite neurologically impaired nine-year old son and wife with fragile mental health); United States v. Goff, 20 F.3d 918, 921 (8th Cir. 1994) (no departure despite wife with depressive disorder and panic attacks and three dependent children); United States v. Sweeting, 213 F.3d 95 (3d Cir. 2000) (no departure despite child with substantial neurological impairment for whom defendant was sole provider).

The government does not mean to deny or diminish the impact that incarcerating Smith will have on his family.  Smith has failed, however, to establish that his situation is exceptional, particularly when one takes into account the other cases in which arguably greater hardships have been deemed insufficient to warrant departures.

## V.     Other Sentencing Matters

The government briefly addresses two other issues potentially implicated by Smith's sentencing: (a) restitution; and (b) the Supreme Court's decision in Blakely v. Washington.

### A.     Restitution

Smith suggests in his departure memorandum that, in lieu of incarceration, he be permitted to pay the back taxes that he owes on his approximately $825,000 in unreported income.[7]

---

[7] To date, it is the government's understanding that Smith has not paid those taxes.  As detailed in the PSR, Smith's monthly income is exhausted trying to cover his family's $17,000+ in monthly spending.

Contrary to Smith's suggestion, the law makes clear that a defendant cannot – after having been caught – effectively "buy" his way out of jail by paying taxes that he evaded or money that he defrauded.  E.g., United States v. Pappert, 112 F.3d 1073, 1079 (10th Cir. 1997) (defendants are not allowed "to buy a sentence reduction after being caught"); United States v. Lucas, 99 F.3d 1290, 1299-1300 (6th Cir. 1996) ("a defendant cannot be permitted under the Guidelines to avoid an increase for amount of loss in a fraud scheme simply by being financially capable of repaying the money when discovered"; otherwise, wealth impermissibly would become "'a determining factor in the calculation of sentences'") (internal citations omitted); United States v. Flowers, 55 F.3d 218, 221-22 (6th Cir. 1995) (defendants convicted of fraud "will not be permitted to buy their way out of jail by subsequently making voluntary restitution"); United States v. Shaffer, 35 F.3d 110, 113-15 (3rd Cir. 1994) (same); United States v. Bennett, 37 F.3d 687, 694-95 (1st Cir. 1994) (district court erred in reducing loss figure by amount of payments made by defendant to settle civil action filed after fraud was discovered); United States v. Brach, 942 F.2d 141, 143 (2d Cir. 1991) (defendant's post-detection repayment of $250,000 did not act to reduce the amount of the loss for sentencing purposes).

Put differently, for a defendant's payment of restitution to have any significance, it must be made before the defendant has reason to fear government prosecution.  See, e.g., United States v. Bogdan, 284 F.3d 324, 330 (1st Cir. 2002) ("the fact that Bogdan is highly introspective and appreciates the criminality of his actions, though admirable, does not serve to make his case at all exceptional, especially considering the facts of his case. The district court found that Bogdan confessed to his illegal conduct 'once everything collapsed.'  It is not uncommon for defendants to discover the virtues of introspection and remorse when facing the threat of

11

punishment. ..."); United States v. O'Kane, 155 F.3d 969, 975-76 (8th Cir. 1998)(defendant who paid full restitution prior to charge, a large part of which consisted of returning stolen goods, did not fall outside the heartland of acceptance of responsibility cases permitting departure); United States v. Hairston, 96 F.3d 102, 108-09 (4th Cir. 1996) (defendant was not entitled to a downward departure when she did not pay bank until after she had been criminally indicted, in order to settle her civil liability, and in the hope of receiving a reduced sentence); United States v. Miller, 991 F.2d 552, 553-54 (9th Cir. 1993)(court delineated three constraints to departures based on payment of restitution; one being "payment had to have been genuinely voluntary, rather than motivated primarily by a collateral consideration such as a desire to settle the civil lawsuit against her... ."); United States v. Brewer, 899 F.2d 503, 509 (6th Cir. 1990) (ruling that remorse and prompt payment of restitution are not enough to take case out of the heartland).[8]

In sum, while Smith is obligated to pay the taxes that he owes, such payments have no bearing on the sentence of imprisonment that the Guidelines require him to serve.

---

[8] In the analogous area of presentence rehabilitation based in part on the cessation of drug use, the First Circuit has made clear that to warrant a reduction in a defendant's sentence beyond that permitted by §3E1.1, the defendant's "rehabilitation" must come before he has been arrested, or has become aware that he is under investigation. This is so because "[s]ome degree of pre-sentence rehabilitation is usually to be expected from a penitent defendant, or one who genuinely shoulders responsibility, or even from one who simply wants to put his best foot forward at sentencing, hopeful of lightening the load." United States v. Sklar, 920 F.2d 107, 116-17 (1st Cir. 1996). See also United States v. Craven, 239 F.3d 91, 99 (1st Cir. 2001) ("The reason that timing matters in rehabilitation cases is that a defendant who decides independently to turn his life around likely deserves higher marks than one who undertakes rehabilitation mainly (or at least partially) to gain advantage in imminent criminal proceedings.").

B.    *Blakely*

Although mentioned only briefly by the defendant in his sentencing memorandum, the Supreme Court's decision in Blakely v. Washington, 2004 WL 1402697 (June 24, 2004), has no effect on the court's imposition of sentence in this case. Even if the Supreme Court ultimately holds that Blakely applies to the federal Sentencing Guidelines, the sentencing outcome in this case would be the same. That is because, even under the reasoning of the majority opinion in Blakely, "[w]hen a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding." 2004 WL 1402697, at *8.

Here, Smith has stipulated that the combined tax loss caused by the offenses to which he has pleaded guilty – i.e., counts one, two and three of the Information – was $175,400. (Plea Agreement ¶ 3(c)). He further stipulated that this loss resulted in a Guidelines offense level, prior to acceptance, of fifteen. (Id. ¶ 3(d)). The government is not requesting that the Court decide or impose any contested fact-based enhancements to this level.

Because a Guidelines sentence can be calculated in this case without any upward enhancements beyond the defendant's admissions and stipulations, the Guidelines remain applicable -- even under Blakely – and Smith should be sentenced under them.

In view of the foregoing, and to avoid any need for a resentencing hearing depending on how the current uncertainty over Blakely ultimately is resolved, the government requests that the Court make clear, by articulating its sentencing determinations in the alternative, that it would arrive at the same outcome irrespective of whether Blakely does, or does not, apply to the federal Guidelines. Specifically, the government requests that the Court specify that it would impose the

same sentence: (1) under the Guidelines without regard to Blakely; (2) in the court's discretion within the statutory range; and (3) under the Guidelines if Blakely applies.

## CONCLUSION

For all of the foregoing reasons, the United States requests that the defendant's motion for a downward departure be denied and that he be sentenced within the applicable guidelines range.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Michael J. Pineault
Michael J. Pineault
Assistant U.S. Attorney
United States Courthouse, Suite 9200
1 Courthouse Way
Boston, MA  02210
(617) 748-3261

Dated: October 22, 2004

CERTIFICATE OF SERVICE

    This is to certify that I have this day served the foregoing document, via electronic means, upon the persons listed below:

| | |
|---|---|
| Peter M. Daigle, Esq. | Ms. Susan Walls |
| 1550 Falmouth Road | U.S. Probation Office |
| Centerville, MA 02632 | |

This 22nd day of October, 2004

           /s/ Michael J. Pineault
          Michael J. Pineault